**CASE NO. 23-1532**

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

MOUNTAIN VALLEY PIPELINE, LLC,

*Plaintiff - Appellee,*

v.

8.37 ACRES OF LAND, OWNED BY FRANK H. TERRY, JR.,
JOHN COLES TERRY, III, AND ELIZABETH LEE TERRY ALSO
KNOWN AS ELIZABETH LEE REYNOLDS ROANOKE COUNTY
TAX MAP PARCEL NO. 102.00-01-02.00-0000 AND
BEING MVP PARCEL NO. VA-RO-046*,*

*Defendant - Appellant,*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE

---

**OPENING BRIEF OF APPELLANT**

---

Norman A. Thomas
NORMAN A. THOMAS, PLLC
1015 East Main Street
Lower Level
Richmond, VA 23129
804-303-9538
norman@normanthomaslaw.com

Joseph V. Sherman
JOSEPH V. SHERMAN, P.C.
324 West Freemason Street
Norfolk, VA 23510
757-350-8308
joe@lawfirmjvs.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1532    Caption: Mountain Valley Pipeline, LLC v. 8.37 Acres of Land

Pursuant to FRAP 26.1 and Local Rule 26.1,

Frank H. Terry, Jr.
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Joseph V. Sherman                    Date:        May 26, 2023

Counsel for: 8.37 Acres of Land

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1532        Caption: Mountain Valley Pipeline, LLC v. 8.37 Acres of Land

Pursuant to FRAP 26.1 and Local Rule 26.1,

John Coles Terry, III
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Joseph V. Sherman _____     Date: ____ May 26, 2023 ____

Counsel for: 8.37 Acres of Land _____

Print to PDF for Filing

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1532    Caption: Mountain Valley Pipeline, LLC v. 8.37 Acres of Land

Pursuant to FRAP 26.1 and Local Rule 26.1,

Elizabeth Terry Reynolds
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
    If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Joseph V. Sherman        Date: May 26, 2023

Counsel for: 8.37 Acres of Land

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

STATEMENT OF THE CASE ....................................................................3

SUMMARY OF THE ARGUMENT ...........................................................20

ARGUMENT ..........................................................................................29

    Standards of Review ...........................................................................29

    Argument ..........................................................................................29

        I.     The district court reversibly erred to grant Mountain Valley Pipeline's Motion for Judgment as a Matter of Law and in the Alternative Motion for a New Trial; to vacate the jury's $523,327 verdict and the judgment order granted thereon; to conditionally grant a new trial with the option of remittitur in the amount of $261,033; and, premised on such rulings, to enter its final judgment order of April 25, 2023 ....................................................31

            A. Fourth Circuit eminent domain law and Dennis Gruelle's credited testimony .........................................................31

            B. The jury decided just compensation based on unobjected-to instructions; MVP invited the purported error upon which it based its Rules 50 and 59 motions .................................35

            C. The jury viewed the property and their verdict was consistent with the clear weight of the evidence; was not excessive; and did not constitute a miscarriage of justice.....................................37

i

II.     The district court reversibly erred by failing to consider and grant the Terrys' Motion for Interest and Costs under Virginia Law, and instead award them interest on the judgment at a lower rate set by federal law and without reimbursement of their litigation costs and expert witness fees ................................................................ 44

    A.  Other Circuits hold that state substantive law on just compensation provides the correct federal rule in NGA condemnations .................................................................... 44

    B.  Just compensation under state law includes interest and potential awards of litigation costs and expert witness fees .......... 46

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 48

CERTIFICATE OF COMPLIANCE ........................................................ 52

# TABLE OF AUTHORITIES

## Cases

*Bison Pipeline, LLC v. 102.84 Acres of Land*,
  560 Fed. Appx. 690 (10th Cir. 2013) .......................................................... 28, 46

*Bosley v. Mineral County Comm'n*,
  650 F.3d 408 (4th Cir. 2011) ...................................................................... 31

*Burgess v. Goldstein*,
  997 F.3d 541 (4th Cir. 2021) ...................................................................... 35

*Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*,
  962 F.2d 1192 (6th Cir.), *cert. denied* 506 U.S. 1022 (1992) ......... 27, 44, 45, 46

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................................................... 32

*Dir. v. Greenwich Collieries*,
  512 U.S. 267 (1994) .................................................................................... 33

*E. Tenn. Natural Gas Co. v. 7.74 Acres*,
  228 Fed. Appx. 323 (4th Cir. 2007) ................................................. 21, 30, 33, 43

*Edmondson v. Am. Motorcycle Ass'n*,
  7 Fed. Appx. 136 (4th Cir. 2001) ................................................................ 29

*Energy Transp. Sys. v. Mackey*,
  674 P.2d 744 (Wyo. 1984) .................................................................... 24, 25, 40

*Gandy v. Robey*,
  520 Fed. Appx. 134 (4th Cir. 2013) ........................................................ 23, 36

*Genge v. Baraboo*,
  241 N.W.2d 183 (Wis. 1976) ................................................................ 25, 26, 41, 42

*Georgia Power Co. v. 138.30 Acres*,
  617 F.2d 1112 (5th Cir. 1980), *cert. denied* 450 U.S. 936 (1981) .............. 45, 46

*Jagow v. E-470 Pub. Highway Auth.*,
  49 P.3d 1151 (Colo. 2002) .................................................................... 24, 39

*Knussman v. Maryland*,
  272 F.3d 625 (4th Cir. 2001) ...................................................................... 30

*Konkel v. Bob Evans Farms*,
  165 F.3d 275 (4th Cir. 1999) ............................................................. 30

*Legacy Data Access, Inc. v. Cadrillion, LLC*,
  889 F.3d 158 (4th Cir. 2018) ............................................................. 33

*Magers v. Bonds (In re Bonds Distrib. Co.)*,
  73 Fed. Appx. 605 (4th Cir. 2003) ................................................ 29, 48

*Myrick v. Prime Ins. Syndicate, Inc.*,
  395 F.3d 485 (4th Cir. 2005) ............................................................. 29

*Northern Natural Gas Co. v. Approximately 9117 Acres In Pratt*,
  114 F. Supp. 3d 1144 (D. Kan. 2015) ................................................ 47

*Pipeline v. 4.31 Acres*,
  Civil Action No. 7:17-cv-00492, 2021 U.S. Dist. LEXIS 106408
  (W.D. Va. June 7, 2021) ............................................................. 28, 47

*Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land in Haverhill*,
  195 F. Supp. 2d 314 (D. Mass. 2002) ................................................ 47

*Questar S. Trails Pipeline Co. v. 3.47 Acres*,
  No. CIV 02-10 BB/LFG, 2003 U.S. Dist. LEXIS 30209
  (D.N.M. July 31, 2003) ..................................................................... 47

*Sabal Trail Transmission, LLC v. Real Estate*,
  No. 1:16-cv-063-MW-GRJ, 2017 U.S. Dist. LEXIS 99370
  (N.D. Fla. June 27, 2017) .................................................................. 47

*South Carolina ex rel. Tindal v. Block*,
  717 F.2d 874 (4th Cir. 1983) ........................................................ 29, 48

*Southern Star Cent. Gas Pipeline, Inc. v. 842 Mineral & Leasehold Acres of Land in Anderson Cnty.*,
  No. 08-1313, 2010 U.S. Dist. LEXIS 145964 (D. Kan. Mar. 16, 2010) ........... 46

*Spears v. Williams Natural Gas Co.*,
  932 F. Supp. 259 (D. Kan. 1996) ............................................ 28, 46, 47

*Staudner v. Robinson*,
  853 Fed. Appx. 806 (4th Cir. 2021) ........................................... *passim*

*Tenn. Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres*,
  931 F.3d 237 (3d Cir. 2019) ....................................................... 27-28, 46

*Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*,
 87 F.3d 654 (4th Cir. 1996) ................................................................. 29

*Treacy v. Newdunn Assocs., LLP*,
 344 F.3d 407 (4th Cir. 2003) ........................................................ 30-31

*United States ex rel. Drakeford v. Tuomey Healthcare Sys.*,
 675 F.3d 394 (4th Cir. 2012) ........................................................ 28, 48

*United States v. 269 Acres*,
 995 F.3d 152 (4th Cir. 2021) ........................................................ 20, 31

*United States v. 1162.65 Acres of Land*,
 498 F.2d 1298 (8th Cir. 1974) ............................................................. 33

*United States v. Bennafield*,
 287 F.3d 320 (4th Cir. 2002) ........................................................ 23, 36

*United States v. Smoot Sand & Gravel Corp.* ,
 248 F.2d 822 (4th Cir. 1957) ....................................................... *passim*

*United States v. Spivey*,
 129 Fed. Appx. 856 (4th Cir. 2005) ......................................... 22-23, 36

*United States v. Wise*,
 131 F.2d 851 (4th Cir. 1942) ........................................................ 23, 37

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
 546 U.S. 164 (2006) ............................................................................. 34

## Statutes

15 U.S.C. § 717 ................................................... 1, 30, 44, 45, 46
16 U.S.C. § 814 ........................................................................... 46
28 U.S.C. § 1291 ............................................................................ 2
28 U.S.C. § 1294 ............................................................................ 2
28 U.S.C. § 1331 ............................................................................ 2
28 U.S.C. § 1961 ........................................................................... 47
Va. Code Ann. § 6.2-302 ............................................................... 47
Va. Code Ann. § 25.1-245 .............................................................. 48

Va. Code Ann. § 25.1-245.1 ............................................................ 47-48

## Other Authorities

Fed. R. Civ. P. 50 ................................................................. *passim*

Fed. R. Civ. P. 59 ................................................................. *passim*

Fed. R. Civ. P. 71.1 ........................................................ 1, 12, 30, 46

U.S. Const. amend. V ........................................................... 20, 31

# JURISDICTIONAL STATEMENT

On October 24, 2017, Mountain Valley Pipeline, LLC ("MVP") filed suit in the Western District of Virginia ("district court" or "court") "[p]ursuant to its power of eminent domain as authorized by the Natural Gas Act ("NGA"), 15 U.S.C. §§717-717z, and Federal Rule of Civil Procedure 71.1[.]"  (JA19-21)  MVP sued to condemn easements on western Virginia tracts including on defendant-appellant, 8.37 acres of land ("the easements"). [1]  (JA17-23, JA57-58)  The property is owned by Frank H. Terry, Jr. ("Frank"), John Coles Terry, III ("Coles"), and Elizabeth Lee Terry Reynolds ("Liz"), herein collectively referred to as the "Terrys."[2] MVP sued for temporary (construction) and permanent easements for pipeline operation and maintenance. (JA21, JA23-25)

The NGA, at §717f(h), authorizes a public convenience and necessity certificate holder to acquire property through eminent domain when it is "unable to agree with the owner" on just compensation for a right-of-way to construct, operate and maintain a pipeline. Subpart (h) grants district courts jurisdiction over these eminent domain cases when the property's value exceeds $3,000.  MVP alleged that each tract's value exceeded $3,000 and that each is in the Western District.  (JA21)

---

[1] The easements also are identified as MVP parcel number VA-RO-046, and as Roanoke County (Virginia) tax map parcel number 102.00-01- 02.00-0000.  (JA23)
[2] Frank owns a life estate in the property, and his siblings, Coles and Liz, co-own the residual estate.  (JA397, JA569)

Also, 28 U.S.C. §1331 provides district courts with "jurisdiction of all civil actions arising under" United States laws, of which the NGA is one.

On April 25, 2023, the district court entered its Order Granting Judgment and Vesting Title to Easements on MVP Parcel No. VA-RO-046 ("final judgment"). (JA1273-1276) The final judgment disposed of all existing claims, i.e., MVP's condemnation of the easements.  It followed the court's April 14, 2023 Order Granting MVP's Motions to Strike, Motion for Judgment as a Matter of Law, Vacating the Jury Verdict and the Judgment Order, Conditionally Granting MVP's Motion for a New Trial with the Option of Remittitur, and Denying Defendants' Motion for Attorney's Fees and Costs ("vacating order").  (JA1271-1271) The court issued a Memorandum Opinion ("opinion") with the vacating order.  (JA1256-1270)

The Terrys noted their appeal on May 12, 2023.  (JA1283-1284) This Court's jurisdiction arises under 28 U.S.C. §1291, granting it "jurisdiction of appeals from all final decisions of the district courts," and §1294(1), directing appeals "to the court of appeals for the circuit embracing the district".

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the district court reversibly err to grant Mountain Valley Pipeline's Motion for Judgment as a Matter of Law and in the Alternative Motion for a New Trial; to vacate the jury's $523,327 verdict and the judgment order granted thereon; to conditionally grant a new trial with the option of remittitur in the amount of

$261,033; and, premised on such rulings, to enter its final judgment order of April 25, 2023?

2. Did the district court reversibly err by failing to consider and grant the Defendants' Motion for Interest and Costs under Virginia Law, and instead award them interest on the judgment amount at a lower judgment interest rate established by federal law and without reimbursement of their litigation costs and expert witness fees?

## STATEMENT OF THE CASE

The appeal focuses on that just compensation owed by MVP to the Terrys for condemnation of the easements (totaling 8.37 acres) across their property.  (JA1283-1284) At the March 2022 trial, the jury awarded the Terrys $523,327.  (JA1049) On April 8, 2022 the district court entered an interlocutory judgment for that amount. (JA1187-1189) MVP then filed its Plaintiff's Motion for Judgment as a Matter of Law and In the Alternative Motion for a New Trial.  (JA1205-1206) The court later ruled for MVP and entered its vacating order.  (JA1271-1272) The order vacated both the jury's verdict and the earlier interlocutory judgment; granted MVP judgment as a matter of law; and conditionally granted "MVP's motion for a new trial with the option of remittitur" in the amount of $261,033.  (JA1271)

The trial evidence included a jury view of the Terrys' 560-acre property ("the property") and a remediation site along the Blue Ridge Parkway.  (JA510-511,

JA555-557); *and view plan* (JA361-363)    Frank testified about the property including its topography, unique features and both its current and potential uses if developed; Virginia's recognition of his home for inclusion in an historic district, and his family's multi-generational ownership.    (JA397-408, JA415-418); *and photos* (JA1052-1074) Frank, age 67 at trial, has managed and lived principally on the property since age 21.  (JA398) Frank stated that in recent years an alternative energy company contemplated developing the property as a wind farm.    (JA408-412, JA415) *and predevelopment map* (JA1075)

During the trial three real estate appraisers testified on property value-related issues.  The Terrys called two; Dennis W. Gruelle ("Gruelle") and Jared Schweitzer ("Schweitzer").    *Gruelle* (JA470-509, JA560-602, JA616-661) *and exhibits* (JA1099-1118, JA1123-1126); *Schweitzer* (JA694-751).    MVP called Joseph Thompson ("Thompson").    (JA762-918) *and exhibits* (JA1127-1152) The Terrys called a fourth appraiser, Larry Steven Noble ("Noble"), to testify in rebuttal of Thompson's testimony.    (JA894-917).    Noble testified to Thompson's faulty methodology in reaching his opinion of the property's value after the easements' condemnation ("after take" value).    (JA894-910) Gruelle's and Schweitzer's testimonies dominate the issues of this appeal.

Gruelle testified to his thirty-eight years of experience, with a career emphasis on appraisals in eminent domain matters.    (JA470-484) He discussed his

certifications and other work-related credentials, including experience conducting appraisals in the Roanoke Valley (wherein the property is located).  Id.  Without objection, the district court deemed him an expert in "eminent domain methodology." (JA484-485)

Gruelle discussed the methodology used and multiple data points researched and considered to appraise a property's value before condemnation of all or a portion of it ("before take" value).  (JA486-506) A before take value considers the market without regard to a condemnation, i.e., "the hypothetical that the project isn't – nobody knows about it, the project is not going to happen." (JA491) The appraisal embodies a property's highest and best use, which is "what use will bring the owner of the property the highest value."  (JA493) If not a property's current use, the highest and best use must be "physically possible," "legally possible," "feasible," and one that will generate "income or value."  (JA494, JA497-499) Gruelle noted that a property's highest and best use may be "a multitude of uses," i.e., "mixed uses or multiple uses." (JA500)

Following data collection and discerning a property's highest and best use, Gruelle then determines which one or combination of appraisal "approaches" to utilize. (JA495, JA501-502)

> There's the sales comparison approach, which is that using similar sales to compare to the subject property.  And that's one that I think we all understand.

> There's the income approach.  If the property has the potential to generate income on a consistent market level, then you can look at an income approach on the property.

> [T]he third approach is a cost approach.  And that approach is used with, generally, unique properties… So if you've got a property with special features and it's not typically traded in the market, then the cost approach is the best approach of the three.

(JA495); *and see* (JA505-507)

When compiling "comparable sales" an appraiser must make adjustments to those sales.  (JA504) For example, "if a comparable sale property "is superior to the property you're appraising, then you adjust it down.  If it's inferior…you adjust it up." Id.  That is, "you're trying to make them equal." Id.  Comparable sales analysis produces a "unit comparison," that is, the appraiser develops a "price per acre…or…selling price per square feet." Id.  The analysis seeks to replicate the market: "How would the market view this property compared to other sales that have occurred in that market?"  (JA506)

With respect to the property's before take value, Gruelle testified as to his appraisal and the methodology that produced it.  (JA568-602, JA616-635) He held his appraisal opinions to a reasonable certainty and he appraised the property's value as of MVP's access to it, March 7, 2018.  (JA573, JA635); *and* Order Granting Immediate Possession of MVP Parcel No. VA-RO-046 (JA51-55)

Gruelle discussed his data collection.  In March 2018 the Roanoke-area market for real estate similar to the property "was a steadily increasing market."

(JA577); *and* (JA578-579) The property contains several unique features germane to its appraisal.  For example, the house, constructed circa 1890, is within the Coles/Terry historical district and is entitled to tax credits of 25% for residential use, and 40% if utilized for commercial use.  (JA579-580) The headwaters of Bottom Creek are on the property and is a "Tier III creek," meaning that it is "the cleanest water you can have designated" by the state of Virginia.  (JA580) All other Tier III creeks are located in national or state parks; Virginia protects Bottom Creek downstream from the property.  (JA580-582)

The property, at 560 acres, constitutes "a huge parcel anywhere" and "there are not a lot of very large parcels like that available" in the Roanoke Valley. (JA582); *and* (JA629, JA659) Although the property lacks public road frontage, it contains three access points, including a private road across Coles' adjacent property, a private road across other property owned by Terry family members, and a fire road. (JA569-572, JA582) Hiking, biking and horse trails exist on the property. (JA401, JA404, JA583) It includes mountaintop ridges with views; provides habitat for abundant wildlife, including trout and game animals; is suitable for agritourism such as a wedding or events venue; offers timbering; and a portion of it on one side of Bottom Creek is suitable for farming.  (JA572, JA578, JA580, JA582-583, JA586); *and* (JA401-404, JA1052-1060)

Since 1938, Appalachian Power has maintained a high voltage power line that crosses a portion of the property. (JA583-584, JA1123) While the 138 kV (kilovolt) power line and its easement yield "pluses and minuses," it "has appeal to green energy users" for either wind or solar power generation. (JA583) Such alternative energy companies "co-locate where there's an available power line." (JA583) Just such a wind and solar energy company, Invenergy, showed interest in the property as a wind farm circa 2007 and leased its entirety in 2012. (JA586-590, JA596-597, JA675); *and* (JA411, JA1075) In 2011, Roanoke County passed an ordinance allowing wind farm use of the property via a permitting process. (JA586)

Invenergy did not construct a wind farm on the property for reasons unrelated to the easements' condemnation:

> I determined that the Invenergy had an alternate facility in Kansas that they wanted to work on, and they were also --there was some -- it was a divorce going on within the company, and the funds were not available to do two projects of that magnitude, so they terminated this one.

(JA656) [3]

---

[3] In his initial appraisal report of April 27, 2020, and in the district court's words, Gruelle relied on "information that the wind farm pulled out of the property and the deal because of the pipeline project, which, unknown to him at the time, was not true." (JA548); *and* (JA90-122; *esp.* JA115) Gruelle submitted a second report dated June 12, 2020 that corrected the error and substantially revised his conclusions. (JA549); *and* (JA150-193) In an August 18, 2020 order, the court found that the report was untimely and went beyond supplementing the April 27th report, and therefore excluded it and testimony based on it. (JA339-340, JA344) Because of the initial appraisal report's error regarding Invenergy's project abandonment, the court

Gruelle testified that the property's highest and best use "would be the wind farm and be coupled with solar," with the wind farm as the main "maximally productive" use. (JA591) He discussed that the property's resultant market value is "predicated on the residential cost. The wind farm is not going to pay less than the residential people. They are going to pay equal to or more than the people buying it for a single family home site or a family subdivision."[4] (JA591); *and* (JA596) The property's market value for alternative energy use is "in competition with" the market for residential users, and that supply and demand "factors are going to mean that property is going to command a little bit higher price, but…it's going to be related to the residential component." (JA591-592) Alternative energy use purchasers "are going to have to pay whatever residential" purchasers are willing to pay. (JA592) As a result, "the alternative energy users are going to have to pay that much for it. They are not going to be able to pay less than the market would pay for a single-family home site or a family subdivision." Id. Gruelle further testified that alternative energy use purchasers "don't pay any more than they have to…They are

_____

did not allow Gruelle "to testify to the value [of the property] after the take or the diminution in value" to the property. (JA553); [clarification added]. The court did allow Gruelle to testify: (a) to the correct methodology to determine a percentage of diminution of the property's value so as to calculate its after take value, and (b) to the easements' detrimental effects on the property's current and potential future uses. (JA636-647)

[4] Because the property lacks public road frontage, it cannot be subdivided into multiple lots for a nonfamily subdivision. (JA585)

9

going to pay based on what their competition is paying, and the competition is the rural residential use. And so they are going to have to pay equal to that to be able to buy the property." (JA594)

To appraise the property's before take value, Gruelle used the cost approach. (JA599) Gruelle chose the cost approach "because of the unique features of this property, I thought it would be more indicative of the market." Id. This approach consisted of two prongs, use of comparable sales to determine the land's value and "a reproduction cost of the improvements." Id. Gruelle explained:

> And so as part of the cost approach, you look at…comparable land sales. And then to that you ultimately do a reproduction cost of the improvements, look at the depreciation. And then by putting the land value, the final reconciled land value, and adding the depreciated cost [of the property's improvements], you have the value through the cost approach as to the value of the whole property in the before. So the first stage is to go out into the market and look for comparable land sales.

(JA599); [clarification added]. [5]

Gruelle described the four comparable sales he researched and adjusted to appraise the property's land and determine a unit value, i.e., a price-per-acre value. (JA600-602, JA616-630); *and* (JA504-505) The comparable sales were in the

---

[5] Gruelle also explained why he did not employ the pure sales comparison approach. (JA599-600) He felt that the several unique features of the property, including the house's inclusion within an historical district eligible for tax incentives, the Tier III creek, and the large size of the 560 acre tract as a market rarity, would make it difficult to find comparative sales of Roanoke-area properties with a similar mix of land and improvement features. (JA600)

Roanoke-area market; were relatively large tracts; two were "very near" a power line; three included creek frontage and one had ponds; three were purchased for residential purposes; the fourth was a "premier residential site" that had "solar potential;" and all of them were "reflective of the residential market" with which alternative energy use purchasers would compete.  (JA600-601) *and* (JA620-624) Gruelle prepared exhibits, including aerial photographs, diagrams of the four properties, and comparison grids.  (JA1105-1118)

After making adjustments to each comparable sale, Gruelle appraised the property's land's unit value at $2,900 per acre, that is, $1,624,000 total for the 560 acres.  (JA631, JA1116-1118) He calculated the replacement cost of the property's house, outbuildings and other improvements at $1,480,000; yet due to their somewhat poor condition he applied an 85% depreciation factor and appraised them at $281,400.  (JA631-635, JA1117-1118) Adding the land and improvements values and rounding down, Gruelle appraised the property's before take value at $1,900,000.  (JA635, JA1117-1118)

As noted, the district court allowed Gruelle to testify to the methodology applied to determine a percentage of diminution of the property's value caused by the easements, and to describe their detrimental effects on the property's current and potential uses.  (JA636-647, JA661) Gruelle testified that the after take value results from a determination of the negative or positive market impact of a condemnation.

(JA566-567) An appraiser expresses the after take value as a "percentage of loss" (or gain) from a property's before take value; the difference between the before take value and the resultant after take value yields a just compensation amount to leave "the owner in the same economic position after the taking as they were before[.]" (JA566-567)

Gruelle recounted the easements' negative effects, such as the permanent restrictions and limitations that the permanent 50-foot clear-cut easement imposes on the property; the privacy loss attendant to pipeline operation and maintenance; soil compaction and increased water run-off into the Tier III creek; vegetation control; and the existence of "line markers" along the easement.[6]  (JA639-647)  He testified that these effects detriment rural residential (i.e. single family or family subdivision) use of the property, cause a loss of its utility, and diminish its marketability.  (JA647)

Schweitzer is an appraiser based in Roanoke.[7]  (JA695) The district court deemed him "an expert in real estate appraising."  (JA697) As had Gruelle,

---

[6] The Terrys also called Ricky Lee Myers, "a design engineering manager for Equitrans Midstream…one of the joint venture partners" in the project with MVP. (JA425-426) Myers corroborated Gruelle's testimony with respect to the restrictions, limitations and effects of the easements.  (JA425-438, JA442-455)

[7] MVP hired Schweitzer to appraise the property for purposes of setting the pre-take security that MVP must deposit pursuant to F. R. Civ. P. 71.1(j).  (JA45, JA48, JA665-666) The district court ruled that upon the Terrys calling him to testify, "it's fair and only truthful to say that it was done for security purposes, but that doesn't necessarily mean that MVP hired him for that purpose."  (JA666) Schweitzer was

Schweitzer testified to the methodology of eminent domain appraisals, including to differentiate between the sales comparison and cost approaches. (JA698-704) He stated that each approach is "a different method" yet agreed that the two approaches "seek to recreate the subject property using data," and that with both approaches "you end up using land sales" and making adjustments to them.[8] (JA704-705)

Schweitzer's company has performed over 200 appraisals of properties affected by the MVP pipeline; he personally performed between fifty and sixty of them. (JA706-707, JA711) To conduct his appraisal he relied in part on his and his firm's previous easement-related appraisals and a regional study containing a "paired sales analysis" and cataloguing "a range of low to high" percentage of diminution to property values caused by natural gas pipeline and power line easements. (JA 707-708) *and* (JA709-712, JA731, JA736, JA747-748) That study of sixteen paired sales is the "Myers & Woods" study and Schweitzer deemed it useful. [9] (JA708, JA711, JA736)

Although Schweitzer had "limited or lack of access" to the property, he collected pertinent data; considered the property's unique features (including the Tier

---

asked only whether he had done "several reports for the purposes of this court relying on them to estimate just compensation in order to allow possession of those properties on this project," to which he answered "Yes." (JA706)

[8] The record contains no testimony or other evidence characterizing either approach as wrong vis-à-vis the property. Each appraiser chose an approach and testified about its application, their chosen comparable sales, and their appraisal opinions.

[9] The Myers & Woods study found a "range of percentage of damage" to individual properties of "[z]ero to 31 percent." (JA731)

III creek); selected and adjusted comparable sales from within the region; and completed an appraisal in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").   (JA714-715, JA717-718, JA735, JA740); *and* (JA723-730) He concluded that the property's highest and best use is "one single family residential homesite and recreational site." (JA715) He opined the property's before take value to be $850,000, including its land and improvements. [10] (JA734)

Schweitzer concluded that the easements damaged the property's market value.  (JA729); *and* (JA716-718, JA725-727) He testified, "[i]n this report, the damage analysis number was 30 percent."   (JA733) *and* (JA751) Schweitzer expressed the easements' damage to the property's market value as a percentage of diminution of value.  (JA733, JA751) Gruelle also testified that a given property's after take value must be derived from a percentage of value diminution.  (JA566, JA567) MVP's own appraiser-witness, Thompson, likewise testified that the easements caused a diminution of value to the property, expressed as a percentage.[11] (JA796) Thompson used the same nomenclature, i.e., percentage of diminution of property value, in testifying about a Pittsylvania County-based paired sales study of

---

[10] Based on a deed description, Schweitzer appraised the property at 400 acres. (JA740-741) He acknowledged the parties' recognition of it as including 560 acres. (JA740-741) The additional 160 acres necessarily would proportionately increase the property's before take value-per-acre, and thus its total before take value.

[11] Thompson "applied a 12 percent diminution for the subject property."  (JA796) He appraised the property's before take value to be $1,200,000.  (JA788)

pipeline-affected properties that he considered.  (JA790-791, JA793, JA795); *and exhibits* (JA1146-1150) Thus, all of the testifying appraisers derived after take property value from a percentage of diminution of value caused by easements, applied to a property's before take value.  None used any other methodology to derive after take value.

On cross-examination, Schweitzer testified that by applying a 30% diminution to his $850,000 before take value (based on only 400 acres), he computed an after take value of $590, 932.  (JA734) By taking the difference, $259,068, and then adding the value of the temporary easements (estimated at $1,965), he yielded a result of $261,033.  (JA738) *and* (JA1275)

MVP also cross-examined Schweitzer about the Myers & Woods study. (JA736-738) Four of its paired sales involved high voltage transmission line easements, and the remainder were for gas pipelines.  (JA736-737) Its percentages of diminution of property value caused by pipelines ranged from zero to seventeen percent.  (JA737) When asked to hypothetically apply a 17% diminution of value to his $850,000 before take figure, and adding-in the temporary easements value, he calculated  $145,477.[12]  (JA737-738)  Yet  on  redirect  examination  and  in

---

[12] This colloquy is significant.  During closing arguments MVP invited the jury to apply the Myers & Woods study's seventeen percent figure to Schweitzer's before take value of $850,000.  MVP counsel argued:

consideration of the property's unique features, Schweitzer reiterated his opinion that the easements caused a 30% diminution of the property's value.  (JA739-741, JA751)

Before the Terrys rested their case in chief, MVP knew that they would ask the jury to credit Gruelle's before take value and Schweitzer's after take 30% diminution of the property's value.  (JA719) After the Terrys rested MVP made its first motion for judgment as a matter of law.  (JA753) MVP sought judgment "in the amount of the appraisal just given by Jared Schweitzer, which is $261,033."  Id.  MVP asserted that it is "inappropriate" for the jury "to be permitted to take a diminution of value used by one appraiser and apply it to some number of another appraiser."  (JA754); *and* (JA755-756)

The Terrys (correctly) argued that "[t]here's not a single case that says the jury has to pick one of the two expert opinions or one of the three expert witnesses."  (JA756) Further, "as long as they are within the range of the evidence presented, then their findings won't be disturbed on appeal."  (JA756) The district court denied the motion:

---

Mr. Schweitzer valued the whole property at 850,000…Mr. Schweitzer said if you use the Myers & Woods number, his number actually would be close to Mr. Thompson's number.  If he uses 17 percent.

(JA1001); *compare* (JA733, JA737-738, JA751) But Schweitzer did not testify that the Myers & Woods study's results yielded a correct percentage of diminution of the property's value.  Nor did either Thompson or Noble.  (JA790, JA908, JA914)

16

> In this case we do have issues of fact that were presented with regard to the highest and best use. There were before the take. There were two different witnesses with regard to that. I also note that we have the issue of fact that the appraisal by Mr. Schweitzer was on only 400 acres of the property, and I don't believe there was any calculation with regard to the additional acreage.

(JA760-761) After all parties rested MVP renewed its Rule 50 motion "on the grounds previously stated." (JA922) It offered no authority. The court denied the motion "[f]or the same reasons I stated previously." (JA923)

During the trial the district court twice asked counsel to review proposed jury instructions. (JA723, JA801) It confirmed that MVP's counsel had done so. (JA920) MVP counsel stated, "we don't have any objections to the instructions that are offered." (JA923) Nor did MVP offer any additional instructions. (JA950) No instruction forbade the jury from crediting Gruelle's before take value and Schweitzer's after take 30% diminution of the property's value. (JA1026-1028)

Instead, the instructions gave the jury wide latitude in resolving fact issues. For example, Instruction 2 charged them "to determine from the evidence what the facts are." Instruction 3 permitted them to "consider the testimony of all witnesses." Instruction 6 advised them that "[y]ou may believe all of what a witness said, or only part of it, or none of it. You are the sole judges of the credibility of the witnesses and the weight of the evidence," that the "testimony of a single witness may be sufficient to prove any fact…if, after considering all the other evidence, you believe that single witness," and that they could "draw from the facts…such reasonable

inferences as may seem justified in light of your own experience." (JA1027, JA1029, JA1032-1033)

During closing arguments the Terrys asked that the jury award them $570,000, based on Gruelle's $1.9 million before take value and Schweitzer's 30% after take diminution of value. (JA967, JA984, JA1004, JA1012) At no time did MVP make an objection to that request. And as noted, MVP itself invited the jury to consider the combination of Schweitzer's $850,000 before take value opinion with the Myers & Woods study's 17% diminution of value to a sampling of pipeline-affected properties. (JA1001)

The district court disregarded Gruelle's testimony regarding the price a potential alternative energy purchaser would pay in relation to that which a potential rural residential purchaser would pay. (JA1259) The following passage encapsulates the district court's basis for granting MVP's Rule 50 motion:

> Ultimately, the glaring issue with combining the opinions of different appraisers in this case is that Gruelle valued the property based on completely different highest and best use than did Schweitzer and Thompson. Gruelle testified that the highest and best use of the property was as a wind farm...There was no evidence of diminution of value or post-take value regarding any commercial or industrial use. Neither Schweitzer, nor Thompson testified to any commercial values or diminution of any commercial value, and Gruelle did not testify to any residential value of the property—either pre-take or post-take. A jury cannot take a pre-take commercial or industrial highest and best use fair market value and then use a residential diminution in value and residential post-take fair market value to determine just compensation under the circumstances of this case...the court finds that there was no credible evidence to support the verdict and the verdict was not within the range of credited testimony.

> Because the jury verdict is not within the range of credited testimony and is against the clear weight of the evidence, MVP is entitled to judgment as a matter of law.

(JA1226) The court granted MVP's Rule 59 motion on the same basis: "MVP is entitled to a new trial for the same reasons it is entitled to judgment as a matter of law: the verdict is against the clear weight of the evidence. The court also notes that granting a new trial would avoid a miscarriage of justice because the jury's verdict awarding $523,327 in damages was more than twice the highest evidence of diminution in value (Schweitzer's 30% diminution plus the value of the temporary easements resulting in $261,033 in damages)."[13]  (JA1267-1268)

On April 14, 2023, the Terrys filed a Motion for Interest and Costs Under Virginia Law.  (JA1250-1255) In support of it they cited federal cases holding that state substantive law provides the proper federal standard for determining just compensation in NGA-related condemnations.  (JA1250-1254) They also cited federal cases holding that state law on just compensation includes statutory provisions for interest and reimbursement of certain litigation expenses.  (JA1250-1254)

MVP responded in opposition to the motion.  (JA1277-1279) The Terrys replied.  (JA1281-1282) Although fully briefed the district court did not specifically

---

[13] The district court ignored the fact that Schweitzer appraised the property at 400 acres instead of its actual 560 acres, and the impact the additional 160 acres would have on the property's market value.

address the motion, however, its final judgment *sub silento* denied it by ordering

interest on the $261,033 at the federal rate and no award of reimbursement for costs

or litigation expenses under Virginia law.  (JA1275-1276)

## SUMMARY OF THE ARGUMENT

I.

A. <u>Fourth Circuit eminent domain law and Dennis Gruelle's credited testimony</u>.

In *United States v. 269 Acres*, 995 F.3d 152, 163-64 (4th Cir. 2021), the Court

recounted key principles governing just compensation determinations:

> When the government uses its power of eminent domain…the Constitution requires it to pay "just compensation." U.S. Const. amend. V…For an easement, that amount is "the difference between the value of the property before and after the Government's easement was imposed."…The relevant "value" is the "fair market value" of the property[.]…The best evidence of property value comes from comparable land sales…"…Very often…identifying the relevant comparisons and making value adjustments often turns into a battle of experts[.]

This case involved a "battle of experts" as to just compensation for the Terrys.

Each appraiser qualified as an expert witness without objection.

In *United States v. Smoot Sand & Gravel Corp.*, 248 F.2d 822, 828 (4th Cir.

1957), the Court upheld a jury verdict that "did not agree with either side in its

valuation of the property as a whole, or, apparently, in the appraisal of component

factors in the valuation."  248 F.2d at 828.  It held "[t]hat the jury's verdict is not

consistent with either party's theory of valuation is no ground for a retrial."  Id., at

829. If the verdict is "within the range of the credited testimony," its judgment "should not be reweighed on appeal." Id.; (citation omitted).

In *E. Tenn. Natural Gas Co. v. 7.74 Acres*, 228 Fed. Appx. 323, 330 (4th Cir. 2007) the Court upheld a district court's Rule 59 motion denial, noting that it was "the jury's decision to weigh the credibility of the witnesses[.]" Moreover, "[t]he mere fact that the jury's verdict in this case exceeds any previous verdict does not mean that there has been a miscarriage of justice." Id.

The term "credited testimony" or "credited evidence" has no uniform definition. Numerous federal decisions use the term. At bottom, its judicial use refers to testimony or evidence that is not patently false and is presented by a knowledgeable witness or authenticated source such that a factfinder may believe and give weight to it. Gruelle's opinion regarding the property's highest and best use and its before take value met this criteria. His highest and best use opinion was corroborated by Invenergy's 2012 lease of the (entire) property. (JA586-590, JA596-597, JA675); *and* (JA411, JA1075) His before take value appraisal, *inter alia*, resulted from his unchallenged experience and qualification as an expert, USPAP-compliant methodology, detailed data collection, consideration of the property's unique features, and confirmed comparable sales of large tract properties. (JA486-506, JA569-602, JA616-635, JA659, JA675, JA1099-1118, JA1123-1126) Gruelle detailed to the jury the market-competitor relationship between prospective rural

residential and alternative energy purchasers; that residential sales (of which all of his comparable sales were) drives the market; and that a rural residential purchaser would pay the same or a little less than an alternative energy purchaser. (JA591-592, JA594, JA596, JA1105-1118)

There is nothing to which Gruelle testified that was unsupported, incredible, or patently false. He equipped the jury with the means by which to comparatively determine the one potential purchaser's price relative to the other's, regardless which highest and best use they decided was correct.

B. The jury decided just compensation based on unobjected-to instructions; MVP invited the purported error upon which it based its Rules 50 and 59 motions.

In making its Rule 50 motion, MVP asserted it was "inappropriate" for the jury "to be permitted to take a diminution of value used by one appraiser and apply it to some number of another appraiser." (JA754); *and* (JA755-756) Yet, MVP made no objection to any jury instruction and offered none to prevent the jury from doing what MVP deemed "inappropriate." Nor did MVP object to the Terrys' closing argument as they asked the jury to credit Gruelle's before take value and Schweitzer's after take 30% diminution of the property's value. (JA719)

Why would MVP so invite (purported) error during the trial, and then challenge it post-trial via Rules 50 and 59 motions? MVP apparently chose to invite the error and yet wait and see if the jury rendered a verdict to its liking. Regardless of MVP's motives, "[i]nvited errors are by definition waived errors." *United States*

*v. Spivey*, 129 Fed. Appx. 856, 859 (4th Cir. 2005); *see also Gandy v. Robey*, 520 Fed. Appx. 134, 144 (4th Cir. 2013) (*accord*); *United States v. Bennafield*, 287 F.3d 320, 325 (4th Cir. 2002) (*accord*).

C. <u>The jury viewed the property and their verdict was consistent with the clear weight of the evidence; was not excessive; and did not constitute a miscarriage of justice.</u>

The jury viewed the property and an MVP-remediated area along the Blue Ridge Parkway. Their view is entitled to "great weight." *United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942).

The jury could have awarded the Terrys nothing or a nominal sum, by accepting Gruelle's highest and best use as including a wind farm that the easements would not affect. Instead, from a *prima facie* standpoint, it appears that the jury credited Schweitzer's rural residential highest and best use and his 30% diminution of property value percentage. It further appears that the jury credited Gruelle's $1.9 million before take value but *reduced* it to something less than $1.75 million to reach their $523,327 verdict. (JA1049) Gruelle testified that alternative energy purchasers "are going to pay equal to or more than the people buying it for a single family home site or a family subdivision." (JA591); *and* (JA592-594)

The district court opined an unsupported scenario: "A jury cannot take a pre-take commercial or industrial highest and best use fair market value and then use a residential diminution in value and residential post-take fair market value to

determine just compensation under the circumstances of this case." (JA1266) The jury's $523,327 verdict does not logically suggest this scenario.

The district court dismissed Gruelle's testimony respecting the market relationship between prospective rural residential and alternative energy purchasers. (JA1259); *compare* (JA591-594)  Yet that testimony derived from his unchallenged experience and qualifications, USPAP-compliant methodology, data collection, consideration of the property's unique features, and confirmed comparable sales. (JA486-506, JA569-602, JA616-635, JA659, JA675, JA1099-1118, JA1123-1126)

The district court's rulings effectively require that a jury must accept both the before take and after take values of one appraiser. (JA1263)  The court relied on three state court cases. (JA1263-1266) They are distinguishable.

In *Jagow v. E-470 Pub. Highway Auth.*, 49 P.3d 1151, 1154 (Colo. 2002) (en banc), the case turned on whether the highway project caused damage to the subject property." Id., at 1157-58.  The record provided no such causation evidence. Id., at 1154-56.  *Jagow* does not support the district court's reasoning; there are no causation issues here.  The appraisers agreed that the easements damaged the property's value. (JA647, JA729, JA733, JA796)

In *Energy Transp. Sys. v. Mackey*, 674 P.2d 744, 746 (Wy. 1984), the Court noted that the just compensation "award must be within the range of the testimony." It reversed the trial court's award because "the value of the land after the taking as

found by the jury was not within the range of such after value contained in the evidence." Id., at 745. *Mackey* set no rule of law forbidding a jury from considering and crediting the opinions of more than one appraiser. And the jury's verdict in this case comports with its stated rule of law. The Terrys sought a $570,000 just compensation award based on Gruelle's before take value and Schweitzer's 30% diminution of value caused by the easements. (JA967, JA984, JA1004, JA1012) MVP sought an award of no more than $261,033 based on Schweitzer's before take value and the property's after take 30% diminution in value, or $150,000 based on Thompson's testimony of 12% diminution in value from a $1.2 million before take value, or even as low as $145,477 based on a combination of Schweitzer's $850,000 before take value with the Myers & Woods study's 17% diminution of value to its sampling of pipeline-affected properties. (JA993-996, JA1000-1001) The jury's $523, 327 award falls within the range.

*Genge v. Baraboo*, 241 N.W.2d 183 (1976) focused on the mathematical differences between the appraisers' before take and after take value opinions. Id., at 183-84. The Court recounted the appraisers' conflicting before take and after take values, with resulting differences of $4,600, $4,500, $2,500, $1,000 or $1,200. Id., at 183-84. The jury awarded $7,995; the trial court ruled it was "not supported by credible evidence and, therefore, was excessive." Id., at 184.

*Genge* noted that the jury's answers to special verdict questions on before and after take values "resulted in an award higher than that established by the testimony of any expert witness." 241 N.W.2d at 184-85. Yet just compensation must be determined "by testimony placing in evidence the value of plaintiff's property immediately before the taking and the value of the remaining property after the taking…The difference between these values reflects the loss…suffered." Id., at 185. *Genge* established no rule of law forbidding a jury from considering and crediting the opinions of more than one appraiser. Nor did it address a range of after take values derived from a percentage of diminution of the subject property's before take value. Instead, based on a range of after take dollar values it found that "the highest credible estimate of that loss is that evidenced by the difference of before- and after-taking values." Id., at 185. The jury's verdict in this case falls within the range of differences between the appraisers' before take and after take values.

The district court granted MVP's Rules 50 and 59 motions for the same reason, to-wit, that "the jury verdict is not within the range of credited testimony and is against the clear weight of the evidence." (JA1266-1268) That finding likewise underpinned its finding that the jury's verdict was excessive and therefore a miscarriage of justice. (JA1267-1268) But the evidentiary record disproves its dispositive-of-all finding. The jury's verdict falls within the range of the credited testimony. Thus, the jury's verdict is not against the weight of the evidence, and is

neither excessive nor a miscarriage of justice. The state caselaw on which the court relied does not support its conclusions. The court relied on erroneous factual and legal premises and committed an error of law, constituting an abuse of discretion. *Staudner*, 853 Fed. Appx. at 810.

II.

A. Other Circuits hold that state substantive law on just compensation provides the correct federal rule in NGA condemnations.

In an NGA condemnation appeal, the Sixth Circuit considered "whether this circuit should develop a federal common-law rule as the standard of valuation, or rather, whether the [NGA] requires that we adopt the law of the state in which the property is situated as the appropriate federal standard." *Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1193 (6th Cir.), *cert. denied* 506 U.S. 1022 (1992). It held that "the federal standard [for just compensation determination] should incorporate the law of the state in which the condemned property is located." Id., at 1194; [clarification added].

The Court discussed five reasons why state substantive law should govern. 962 F.2d at 1198-99. The Terrys note two: (1) "property rights have traditionally been…defined in substantial part by state law," and (2) "incorporating state law…will not frustrate" the NGA's purposes. Id.

Since *Columbia Gas*, the Third and the Tenth Circuits have followed its rule of law. *See Tenn. Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres*,

27

931 F.3d 237 (3rd Cir. 2019); *Bison Pipeline, LLC v. 102.84 Acres of Land*, 560 Fed. Appx. 690 (10th Cir. 2013).

The Terrys submit that the Third, Sixth and Tenth Circuits' reasoning is correct and request that this Court hold that state substantive law on just compensation provides the correct federal rule in NGA condemnations.

B. Just compensation under state law includes potential awards of litigation costs and expert witness fees.

In *Spears v. Williams Natural Gas Co.*, 932 F. Supp. 259 (D. Kan. 1996), the Court held as follows: "The rationale of the courts in *Columbia Gas* and *Georgia Power* is equally applicable…with respect to the interest rate to be applied." Other courts have adopted this holding for interest rates and the award of certain costs and litigation expenses; however, the Western District has held to the contrary regarding interest.  *Pipeline v. 4.31 Acres*, Civil Action No. 7:19-cv-00679, 2021 U.S. Dist. LEXIS 106408 (W.D. Va. June 7, 2021).  The Terrys submit that *Spears* and its progeny are correctly decided.  They request adoption of the same rule of law.

The parties fully briefed the Motion for Interest and Costs Under Virginia Law and the Terrys request that the Court decide its issues of law.  Should the Court reverse the district court's judgment and remand for the entry of final judgment with instructions, the issues raised in the motion will arise again.  *See United States ex rel. Drakeford v. Tuomey Healthcare Sys.*, 675 F. 3d 394, 406 (4th Cir. 2012) ("we may address issues that are likely to recur on remand").  Also, because the

determination of just compensation implicates the Terrys constitutional rights, the Court properly may decide those issues. *South Carolina ex. Rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983). A district court's failure to address a motion may constitute an abuse of discretion. *Magers v. Bonds (In re Bonds Distrib. Co.)*, 73 Fed. Appx. 605, 606 (4th Cir. 2003).

## **ARGUMENT**

## **Standards of Review**

The Court reviews de novo a district court's decision to grant a Rule 50 motion for judgment as a matter of law. *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 658 (4th Cir. 1996); *Edmondson v. Am. Motorcycle Ass'n*, 7 Fed. Appx. 136, 146 (4th Cir. 2001).

If the evidence "is susceptible of more than one reasonable inference, a jury issue is created and motion for judgment as a matter of law should be denied…we review the evidence in the light most favorable to the nonmoving party." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489-90 (4th Cir. 2005) (citations omitted). Stated differently, "[e]ntry of judgment as a matter of law is appropriate only if the evidence is legally insufficient to support the jury's verdict…In considering this question, 'we may not substitute our judgment for that of the jury or make credibility determinations.'" *Staudner v. Robinson*, 853 Fed. Appx. 806, 809 (4th Cir. 2021).

The Court reviews a district court's ruling on a Rule 59 according to the abuse of discretion standard. *Staudner*, 853 Fed. Appx. at 810.

> A court should grant a new trial only if the verdict (1) "is against the clear weight of the evidence, or (2) is based on evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."

*E. Tenn. Natural Gas Co. v. 7.74 Acres*, 228 Fed. Appx. 323, 329 (4th Cir. 2007) (*quoting Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001). Nevertheless, the issue whether a jury award is excessive "is a question of law." *Konkel v. Bob Evans Farms*, 165 F.3d 275, 280 (4th Cir. 1999).

A district court abuses its discretion when it "acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *Staudner*, 853 Fed. Appx. at 810 (citation omitted). Under Rule 59 the Court may weigh the evidence and consider witness credibility. Id. "The crucial inquiry on review is whether an error occurred in the conduct of trial that was so grievous as to have rendered the trial unfair." Id., (citation omitted).

The issue whether state substantive law provides the proper federal standard for determining just compensation in NGA condemnations turns on interpretation of 15 U.S.C. 717f(h). That interpretation also bears on the procedures of F. R. Civ. P. 71.1. The Court reviews a district court's interpretation of a federal statute de novo and applies the same standard to federal rule interpretation. *Treacy v. Newdunn*

*Assoc., LLP*, 344 F.3d 407, 410 (4th Cir. 2003) (statute interpretation); *Bosley v. Mineral County Comm'n*, 650 F.3d 408, 411 (4th Cir. 2011) (statute and rule).

## Argument

**I. The district court reversibly erred to grant Mountain Valley Pipeline's Motion for Judgment as a Matter of Law and in the Alternative Motion for a New Trial; to vacate the jury's $523,327 verdict and the judgment order granted thereon; to conditionally grant a new trial with the option of remittitur in the amount of $261,033; and, premised on such rulings, to enter its final judgment order of April 25, 2023.**

## A. Fourth Circuit eminent domain law and Dennis Gruelle's credited testimony.

In *United States v. 269 Acres*, 995 F.3d 152, 163-64 (4th Cir. 2021), the Court recounted key principles governing just compensation determinations. Several deserve quotation; they applied to the trial.

> When the government uses its power of eminent domain to take private property rights, the Constitution requires it to pay "just compensation." U.S. Const. amend. V. "[J]ust compensation" is the "amount of money necessary to put a landowner in as good a pecuniary position, but no better, as if his property had not been taken."

> For an easement, that amount is "the difference between the value of the property before and after the Government's easement was imposed."

> A particular property may be "adaptable to several uses" so "just compensation is measured by the use that would bring the highest price—the 'highest and best' use."…But compensation is not limited to the current use of the property, as it "also includes any additional market value it may command because of the prospects for developing it to the 'highest and best use' for which it is suitable."

> But to base compensation on a use other than the current one, the landowner must produce evidence that the proffered use is "'reasonably

probable' and that the probability has a real market value."…there must be demand for the use in the "reasonably near future."

The best evidence of property value comes from comparable land sales, where the more similar the land is the more probative the sale price is…[I]dentifying the relevant comparisons and making value adjustments often turns into a battle of experts[.]

This case involved a "battle of experts" as to just compensation. The appraisers expressed opinions on the property's highest and best use, before take value, and the easements' resultant percentage of diminution to its market value, i.e., its after take value. Each appraiser qualified as an expert witness without objection. The district court struck no appraiser testimony under *Daubert* or for any other reason. [14]   In denying MVP's motions for judgment as a matter of law the court recognized "issues of fact" for the jury. (JA760-761); *and* (JA923)

In *United States v. Smoot Sand & Gravel Corp.*, 248 F.2d 822, 828 (4th Cir. 1957), the Court upheld a jury verdict wherein the jury "did not agree with either side in its valuation of the property as a whole, or, apparently, in the appraisal of component factors in the valuation." 248 F.2d at 828. Noting that it was the jury's province to determine market value, it held "[t]hat the jury's verdict is not consistent with either party's theory of valuation is no ground for a retrial." Id., at 829. If the verdict is "within the range of the credited testimony," the jury's judgment "should not be reweighed on appeal." Id.; (citation omitted).

---

[14] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

In *E. Tenn. Natural Gas Co. v. 7.74 Acres*, 228 Fed. Appx. 323, 330 (4th Cir. 2007) the Court upheld a district court's Rule 59 motion denial, noting that it was "the jury's decision to weigh the credibility of the witnesses presented by both sides." Moreover, "[t]he mere fact that the jury's verdict in this case exceeds any previous verdict does not mean that there has been a miscarriage of justice." Id. The Court cited *Smoot* for the proposition that a new trial is not warranted where a jury verdict is "within the range of credited testimony."[15] Id.

The term "credited testimony" or "credited evidence" has no uniform definition. For example, in *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 168 (4th Cir. 2018), a contractual dispute over payment of a deferred purchase price for business assets ("Call Price"), the Court found that the evidence was "clear, convincing and uncontradicted that the Call Price was *at least* $460,406, and could not be as low as the $256,500 awarded by the jury." (Emphasis in original) Noting that in *Smoot*, the jury's verdict "'was *within* the range of credited testimony,'" it held the $256,000 jury award "'*below* the range of credited testimony,'" entitling the plaintiff to a new trial. Id.; (emphasis in original).

The Supreme Court used the term in *Dir. v. Greenwich Collieries*, 512 U.S. 267, 280 (1994), a Black Lung Benefits Act case, in writing of the applicant's burden

---

[15] *Cf. United States v. 1162.65 Acres of Land*, 498 F.2d 1298, 1301-02 (8th Cir. 1974) (upholding a jury commission award outside scope of the evidence when based on the underlying evidence supporting the appraisers' conflicting opinions).

of proof and that "when the party with the burden of persuasion establishes a prima facie case supported by 'credible and credited evidence,' it must either be rebutted or accepted as true."  In *Volvo Truck N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 187-88 (2006) (J. Ginsburg, dissenting), Justice Ginsburg used the term to refer to evidence "in which the jury credited that discriminatory prices were employed].]"

Numerous federal decisions use the term.  At bottom, its judicial use refers to testimony or evidence that is not patently false and is presented by a knowledgeable witness or authenticated source such that a factfinder may believe and give weight to it.  Gruelle's opinion regarding the property's highest and best use and its before take value met this criteria.  His highest and best use opinion was corroborated by Invenergy's 2012 lease of the (entire) property.  (JA586-590, JA596-597, JA675); *and* (JA411, JA1075) His before take value appraisal resulted from his experience and qualifications, USPAP-compliant methodology, data collection, consideration of the property's unique features, and comparable sales of large tract properties. (JA486-506, JA569-602, JA616-635, JA659, JA675, JA1099-1118, JA1123-1126) Gruelle detailed to the jury the market-competitor relationship between prospective rural residential and alternative energy purchasers; that residential sales (of which all of his comparable sales were) drives the market; and that a rural residential purchaser would pay the same or a little less than an alternative energy purchaser. (JA591-592, JA594, JA596, JA1105-1118)

There is *nothing* to which Gruelle testified that was unsupported, incredible, or patently false. He articulated how a potential rural residential and an alternative energy purchasers' prices would relate to each other. (JA591-594) By this testimony, he equipped the jury with the means by which to comparatively determine the one potential purchaser's price relative to the other's, regardless which highest and best use they decided upon. The record validates that Gruelle's testimony was credible and worthy of credit. It was up to the jury to accept or reject it in whole or in part.

"A district court abuses its discretion when it…relies on erroneous factual or legal premises, or commits an error of law." *Staudner*, 853 Fed. Appx. at 810. Jury reliance on Gruelle's testimony was entirely appropriate. *Burgess v. Goldstein*, 997 F.3d 541, 554 (4th Cir. 2021) (Rule 50 motion; "we emphasize the importance of the jury's role in trials, a role enshrined in the Seventh Amendment"); *Staudner*, *supra*, at 810 (Rule 50 motion; "The crucial inquiry on review is whether an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair"). The district court erroneously and prejudicially granted MVP's Rules 50 and 59 motions.

**B. The jury decided just compensation based on unobjected-to instructions; MVP invited the purported error upon which it based its Rules 50 and 59 motions.**

In making its Rule 50 motion, MVP asserted it was "inappropriate" for the jury "to be permitted to take a diminution of value used by one appraiser and apply

it to some number of another appraiser."  (JA754); *and* (JA755-756) Yet, MVP made no objection to any jury instruction and offered none to prevent the jury from doing what MVP deemed "inappropriate."  Nor did MVP object to the Terrys' closing argument, passively watching them ask the jury to credit Gruelle's before take value and Schweitzer's after take 30% diminution of the property's value.  (JA719)

Why would MVP invite (purported) error during the trial, and then challenge it post-trial with Rules 50 and 59 motions?  One may conclude that MVP chose to invite the error and yet wait and see if the jury rendered a verdict to its liking.[16]

Regardless of MVP's motives, "[i]nvited errors are by definition waived errors."  *United States v. Spivey*, 129 Fed. Appx. 856, 859 (4th Cir. 2005); *see also Gandy v. Robey*, 520 Fed. Appx. 134, 144 (4th Cir. 2013) (*accord*); *United States v. Bennafield*, 287 F.3d 320, 325 (4th Cir. 2002) (*accord*).  The Terrys' argued that MVP failed to object to any of the jury instructions and that the Fourth Circuit's precedent "supports the jury verdict not needing to track an appraiser's testimony." (JA1227-1228); (*citing Smoot*, 248 F.2d at 828-29)

The district court reversibly erred to grant MVP's motions, as they were premised on what MVP purports was error, yet itself invited.

---

[16] As noted, MVP itself invited the jury to consider the combination of Schweitzer's $850,000 before take value with the Myers & Woods study's 17% diminution of value to its sampling of pipeline-affected properties.  (JA1001)

**C. The jury viewed the property and their verdict was consistent with the clear weight of the evidence; was not excessive; and did not constitute a miscarriage of justice.**

The jury viewed the property and an MVP-remediated area. Their view is entitled to "great weight." *United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942). As stated in *Smoot*, "[t]he jury heard the experts presented by the parties and could accept or reject any part of their testimony…Having seen the property, it had wide latitude for the application of its own judgment." 248 F.2d at 829.

The jury could have awarded the Terrys nothing or a nominal sum, by accepting Gruelle's highest and best use as including a wind farm that the easements would not affect. Instead, from a *prima facie* standpoint, it appears that the jury credited Schweitzer's rural residential highest and best use and his 30% diminution of property value percentage. It further appears that the jury credited Gruelle's $1.9 million before take value but *reduced* it to something less than $1.75 million to reach their $523,327 verdict. (JA1049) The evidence and the jury instructions empowered the jury to reach such a conclusion. Gruelle testified that residential use drives the market and that alternative energy purchasers "are going to pay equal to or more than the people buying it for a single family home site or a family subdivision." (JA591); *and* (JA592-594)

The district court, however, opined an unsupported decisional scenario: "A jury cannot take a pre-take commercial or industrial highest and best use fair market

value and then use a residential diminution in value and residential post-take fair market value to determine just compensation under the circumstances of this case." (JA1266) Respectfully, this scenario is speculative. The jury's $523,327 verdict does not logically suggest it. Once again, Gruelle's testimony equipped the jury to relate a potential rural residential and an alternative energy purchaser's prices to each other. (JA591-592, JA594, JA596, JA1105-1118)

The district court's opinion opened by criticizing Gruelle for the error in his April 27, 2020 report regarding the Invenergy deal's collapse and for his June 12, 2020 report. (JA1257-1258) These matters were irrelevant to MVP's Rules 50 and 59 motions. The motions focus on the evidence presented. The court excluded testimony based on the second report. (JA339-340, JA344) Outside the jury's presence, the court acknowledged that Gruelle relied on "information that the wind farm pulled out…because of the pipeline project, which, unknown to him at the time, was not true." (JA548) It did not then pejoratively characterize the error. In fact, MVP cross-examined Gruelle about the error and the excluded report. (JA677-680) It was the jury's province to decide upon Gruelle's credibility and the proper weight of his testimony. *See* Instruction No. 6 (JA1032-1033)

Without analysis, the district court dismissed Gruelle's testimony on the market relationship between prospective rural residential and alternative energy purchasers. (JA1259) Yet that testimony derived from his unchallenged experience

and qualifications, USPAP-compliant methodology, data collection, consideration of the property's unique features, and confirmed comparable sales. (JA486-506, JA569-602, JA616-635, JA659, JA675, JA1099-1118, JA1123-1126)

The district court's rulings effectively require that a jury must accept both the before take and after take values of one appraiser. (JA1263) No federal authority imposes such a requirement. The court supported its opinion by relying on three state court cases. (JA1263-1266) Yet those cases establish no such requirement and are otherwise distinguishable from this case.

In *Jagow v. E-470 Pub. Highway Auth.*, 49 P.3d 1151, 1154 (Colo. 2002) (en banc), the Court held that "the $ 2.88 million award for damages to the remainder property had no support in the evidence and was excessive as a matter of law." The holding reflected the fact that the landowners, "[o]ther than the $100,000 cost to redo" a property development plan, "identified no compensable, quantifiable damages to the remainder property[.]" Id. The central issue turned on whether the highway project damaged the property's value; "[t]here must be competent evidence…to show that the taking caused the depreciation in value." Id., at 1157-58. The record provided no such causation evidence. Id., at 1154-56. The Court concluded that "[i]n the face of conflicting evidence, the appellate court will generally refuse to modify the decision" so long as there is "some credible evidence in the record" to support the compensation award. Id., at 1157-58.

*Jagow* does not support the district court's reasoning.  The appraisers agreed that the easements damaged the property's value.  (JA647, JA729, JA733, JA796) There are no causation-related issues.

In *Energy Transp. Sys. v. Mackey*, 674 P.2d 744, 746 (Wy. 1984), the Court noted that the just compensation "award must be within the range of the testimony." It reversed the trial court's award because "the value of the land after the taking as found by the jury was not within the range of such after value contained in the evidence." Id., at 745.  The Court held that:

> The jury must gauge the credibility of the witnesses and of their appraisal methods and techniques and arrive at a "before" and at an "after" value, both within the ranges of evidence presented for such purposes.  But to avoid an unbelievable result, *it must also* end up with a difference between the two within the range of the differences resulting from the "before" and "after" values of each witness.

Id., at 747.

First, *Mackey* set no rule of law forbidding a jury from considering and crediting the opinions of more than one appraiser.  Second, the jury's verdict in this case comports with the above-stated rule of law.  The Terrys sought a $570,000 just compensation award based on Gruelle's before take value and Schweitzer's 30% diminution of value caused by the easements.  (JA967, JA984, JA1004, JA1012) MVP sought an award of no more than $261,033 based on Schweitzer's before take value and the property's after take 30% diminution in value, or $150,000 based on Thompson's testimony of 12% diminution in value from a $1.2 million before take

value, or even as low as $145,477 based on a combination of Schweitzer's $850,000 before take value with the Myers & Woods study's 17% diminution of value to its sampling of pipeline-affected properties.  (JA993-996, JA1000-1001)  The jury's $523, 327 award falls within the range.  The jury necessarily reduced Gruelle's $1.9 million before take value to something less than $1.75 million, *consistent with* his testimony that a prospective rural residential purchaser would pay the same or somewhat less than a prospective alternative energy purchaser.  (JA591-594, JA596, JA1105-1118)

*Genge v. Baraboo*, 241 N.W.2d 183 (1976) focused on the mathematical differences between the appraisers' before take and after take dollar value opinions. Id., at 183-84.  The Court recounted the before take and after take value of each appraiser, resulting differences of $4,600, $4,500, $2,500, and either $1,000 or $1,200.[17]  Id., at 183-84.  The jury awarded $7,995; the trial court determined it was "not supported by credible evidence and, therefore, was excessive." Id., at 184.  The court granted a new trial with an option for remittitur for $4,600.  Id., at 184. On appeal, the Court affirmed.  Id., at 185.

*Genge* noted that the jury's answers to special verdict questions on before and after take values "resulted in an award higher than that established by the testimony

---

[17] One appraiser testified to a difference of $14,100, however, the before and after take values were based on an incorrect assumption and the trial court ruled that the jury could not consider this appraisal opinion.  Id., at 184.

of any expert witness." 241 N.W.2d at 184-85. It stated that just compensation must be determined "by testimony placing in evidence the value of plaintiff's property immediately before the taking and the value of the remaining property after the taking…The difference between these values reflects the loss plaintiffs have suffered." Id., at 185. It then held that "in the instant case, if the award were not limited to the range of differences in evidence, but only to the range of before- and after-taking values," the jury could have awarded an amount roughly equal to or greater than the subject property's before take value; i.e., an award not supported by credible evidence. Id., at 185.

*Genge* established no rule of law forbidding a jury from considering and crediting the opinions of more than one appraiser. Nor did it address a range of after take values derived from a percentage of diminution of the subject property's before take value – (the methodology employed by each appraiser in this case). Instead, and based on a range of after take dollar values opined by the appraisers, *Genge* held only that "the highest credible estimate of that loss is that evidenced by the difference of before- and after-taking values." Id., at 185. As discussed above, the jury's verdict in this case falls within the range of differences between the appraisers' before take and after take values; it comports with the stated rule of law.

The district court granted MVP's Rules 50 and 59 motions for the same reason, to-wit, that "the jury verdict is not within the range of credited testimony and

is against the clear weight of the evidence." (JA1266-1268) That finding underpinned granting MVP judgment as a matter of law, conditionally granting a new trial with option for remittitur, as well as the court's finding that the jury's verdict was against the weight of the evidence, excessive, and therefore a miscarriage of justice. (JA1267-1268)

But the evidentiary record disproves the district court's dispositive-of-all finding. The court misevaluated the credible and credited evidence. The jury's verdict falls within the range of the credited testimony and properly should withstand judicial scrutiny in keeping with the Terrys' Fifth and Seventh Amendment rights.[18] As a result, the jury's verdict is not contrary to the weight of the evidence, is not excessive and does not constitute a miscarriage of justice. *E. Tenn. Natural Gas*, 228 Fed. Appx. at 330 (that verdict deemed high "does not mean that there has been a miscarriage of justice.") Nor does the state caselaw on which the court relied support its legal conclusions.

The district court relied on erroneous factual and legal premises, and committed an error of law. *Staudner*, 853 Fed. Appx. at 810. It thereby committed

---

[18] The verdict is fully consistent with *Smoot*, wherein the jury "did not agree with either side in its valuation of the property as a whole, or, apparently, in the appraisal of component factors in the valuation." 248 F.2d at 828. The Court held that it was the jury's province to determine market value and "[t]hat the jury's verdict is not consistent with either party's theory of valuation is no ground for a retrial." Id., at 829.

an abuse of its discretion.  Id.  No "error occurred in the conduct of trial that was so grievous as to have rendered the trial unfair."  Id.

**II. The district court reversibly erred by failing to consider and grant the Terrys' Motion for Interest and Costs under Virginia Law, and instead award them interest on the judgment at a lower rate set by federal law and without reimbursement of their litigation costs and expert witness fees.**

**A. Other Circuits hold that state substantive law on just compensation provides the correct federal rule in NGA condemnations.**

In an NGA condemnation appeal, the Sixth Circuit considered "whether this circuit should develop a federal common-law rule as the standard of valuation, or rather, whether the [NGA] requires that we adopt the law of the state in which the property is situated as the appropriate federal standard."  *Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1193 (6th Cir.), *cert. denied* 506 U.S. 1022 (1992); [clarification added].  The Court held that "the federal standard [for just compensation determination] should incorporate the law of the state in which the condemned property is located."  Id., at 1194; [clarification added].

The Court observed that the NGA's interpretation is a matter of federal law. 962 F.2d at 1196.  "Less obvious is whether…the Court should fashion a federal common-law rule as the federal standard or instead, adopt the law of the state in which the condemned property is situated."  Id., at 1196-97.  The Court then considered 15 U.S.C. §717f(h), highlighting its requirement that the "practice and

procedure" in an NGA condemnation "shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated[.]" 962 F.2d at 1197.  It found "a number of reasons supporting adopting state law as the federal standard for determining compensation under §717f(h)."  Id., at 1198.

The Court discussed five reasons.  962 F.2d at 1198-99.  The Terrys especially note two of them.  First, "property rights have traditionally been…defined in substantial part by state law."  Id., at 1198.  Second, "incorporating state law as the federal standard will not frustrate the specific objectives of the Natural Gas Act."  Id. The Court explained:

> The only conceivable effect that adopting state law as the measure of compensation might have on this purpose would be that condemnors proceeding under the Act might be required to pay more or less than under an alternative federal common-law rule.  To the extent that compensation under state law might deviate from that under a federal rule, we believe this variance, in the aggregate, is far too speculative to warrant displacing state law. Furthermore, even if it could be shown that state law might result, on average and over time, in consistently greater or lesser awards, we seriously doubt that the amount would rise to the level of frustrating the specific objectives of the Natural Gas Act.

Id., at 1198.

The Court favorably cited *Georgia Power Co. v. 138.30 Acres of Land*, 617 F.2d 1112 (5th Cir. 1980) (en banc), *cert. denied* 450 U.S. 936 (1981).  There, the Fifth Circuit interpreted the Federal Power Act's "materially identical" language to hold that "the law of the state where the condemned property is located was to be

adopted as the appropriate federal rule for determining just compensation." 962 F.2d at 1197-98; (*comparing* 15 U.S.C. §717f(h) *with* 16 U.S.C. §814).

Since *Columbia Gas*, the Third and the Tenth Circuits have held that state substantive law on just compensation provides the federal rule in NGA condemnations. *Tenn. Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres*, 931 F.3d 237 (3rd Cir. 2019); *Bison Pipeline, LLC v. 102.84 Acres of Land*, 560 Fed. Appx. 690 (10th Cir. 2013).

The Terrys submit that the Third, Sixth and Tenth Circuits' reasoning is correct and request that this Court hold that state substantive law on just compensation provides the correct federal rule in NGA condemnations. *See also disc'n Georgia Power*, 617 F.2d 1115-22. They further request that the Court mandate that F. R. Civ. P. 71.1 henceforth be interpreted consistently with this rule. *See Southern Star Cent. Gas Pipeline, Inc. 842 Mineral & Leasehold Acres of Land*, 2010 U.S. Dist. LEXIS 145964, **5-6, 8 (D. Kan. March 16, 2010) (F. R. Civ. P. 71.1 is procedural; Kansas substantive law governs the issue of just compensation).

**B. Just compensation under state law includes interest and potential awards of litigation costs and expert witness fees.**

In *Spears v. Williams Natural Gas Co.*, 932 F. Supp. 259 (D. Kan. 1996), the Court held as follows:

> The rationale of the courts in *Columbia Gas* and *Georgia Power* is equally applicable in the instant case, with respect to the interest rate to be applied. In short, incorporating the state interest rate will not

> frustrate the objectives of the Natural Gas Act. It will, however, discourage forum-shopping based on differential interest rates. We do not believe that Congress intended [28 U.S.C. §1961] to provide an incentive to condemners to bring actions under the Natural Gas Act in federal, rather than state court, in order to take advantage of a lower interest rate.

Id., at 260-61; [clarification added].

Other courts have adopted this holding as to state statutory interest rates and provisions for the award of certain costs and litigation expenses. *See e.g. Sabal Trail Transmission, LLC v. Real Estate*, 2017 U.S. Dist. LEXIS 99370 (N.D. Fla. June 27, 2017); *Questar S. Trails Pipeline Co. v. 3.47 Acres*, 2003 U.S. Dist. LEXIS 30209 (D. N.M. July 31, 2003). *See also Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land in Haverhill*, 195 F. Sup 2d 314 (D. Mass. 2002); *Northern Natural Gas Co. v. Approximately 9117 Acres*, 114 F. Supp. 3d 1144 (D. Kan. 2015). The Western District of Virginia has held to the contrary regarding interest on a just compensation award. *Pipeline v. 4.31 Acres*, Civil Action No. 7:19-cv-00679, 2021 U.S. Dist. LEXIS 106408 (W.D. Va. June 7, 2021).

The Terrys submit that *Spears* and its progeny correctly include state substantive law on judgment interest and the recovery of costs and certain litigation expenses as a component of just compensation. They request that Court adopt the same rule of law in the Fourth Circuit. In so doing, the Terrys seek six-percent interest on the judgment in this case pursuant to Va. Code §6.2-302. They also seek recovery of costs and various (including expert-related) fees as provided for by Va.

Code §25.1-245.1.  *See also* Va. Code §25.1-245 (Repealed Acts 2020, c. 1244) to the extent that it may to apply.

Although the parties fully briefed the Terrys' Motion for Interest and Costs Under Virginia Law, the district court did not directly address it and instead *sub silento* denied it in the final judgment.  (JA1250-1255, JA1273-1282) The Terrys request that the Court decide the issues of law that the motion presents.  Should the Court reverse the district court's judgment and remand with instruction for entry of final judgment, the issues raised by the motion again will arise in the district court.  *See United States ex rel. Drakeford v. Tuomey Healthcare Sys.*, 675 F. 3d 394, 406 (4th Cir. 2012) ("our precedent is clear that we may address issues that are likely to recur on remand").

Moreover, because the determination of just compensation implicates the Terrys Fifth Amendment rights, the Court properly may address the motion.  *See South Carolina ex. Rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983).  Under the circumstances of this case, the Court also may consider the district court's failure to directly address the motion as an abuse of discretion.  *See Magers v. Bonds (In re Bonds Distrib. Co.)*, 73 Fed. Appx. 605, 606 (4th Cir. 2003).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The district court reversibly erred to grant MVP's Motion for Judgment as a Matter of Law and in the Alternative Motion for a New Trial.  Concomitantly, it

reversibly erred to vacate the jury's $523,327 verdict and the judgment order granted thereon; to conditionally grant a new trial with the option of remittitur in the amount of $261,033; and, premised on such rulings, to enter its final judgment. The jury rendered its verdict in accordance with its unobjected-to instructions. The verdict rested on sufficient credible and credited evidence; was consistent with the clear weight of the evidence; was not excessive; and did not constitute a miscarriage of justice.

The district court likewise reversibly erred in failing to consider and grant the Defendants' Motion for Interest and Costs under Virginia Law. The Terry's timely filed the motion and the parties fully briefed it. As a matter of law, the Terrys ask that the Court adopt the view of other federal circuit courts that state substantive law provides the proper federal standard for determining just compensation to property owners in NGA-authorized eminent domain proceedings. Pursuant to that holding, just compensation to the Terry's includes their entitlement to interest at Virginia's statutory six-percent judgment rate, along with costs and eligibility for fees as provided for by Virginia law.

The Terrys request that the Court:

(1) Reverse the district court's judgment granting MVP's Rules 50 and 59 motions, its vacation of the jury's verdict, and its conditional grant of a new trial new with the option of remittitur in the amount of $261,033;

(2) Reinstate the jury's $523,327 verdict award in the Terry's favor;

(3) Enter final judgment in the Terry's favor for $523,327, or, as a less preferred alternative, remand the case to the district court with a directive to enter judgment in the Terrys' favor in the amount of $523,327;

(4) Hold that state substantive law provides the proper federal standard for determining just compensation to property owners in NGA-authorized eminent domain proceedings, including the judgment interest rate and the award of such costs and fees as state law may provide;

(5) Hold (in accordance with F. R. App. P. 37(b)) that the Terrys are entitled to interest on the judgment amount at Virginia's statutory six-percent judgment rate and so instruct the district court;

(6) Hold that the Terrys are entitled to such costs and fees as Virginia law may provide, and remand the case to the district court with instructions: (a) to determine the amounts of costs and fees to which the Terrys are entitled under Virginia law, and (b) to enter judgment in the Terrys' favor for those amounts; and

(7) Award the Terrys their appellate costs pursuant to F. R. App. P. 39 and Fourth Circuit Local Rules 39(a) and 39(c).

Finally, the Terrys request oral argument pursuant to F. R. App. P. 34 and Fourth Circuit Local Rule 34(a).  Their appeal asserts their Fifth Amendment right to just compensation in eminent domain proceedings and their Seventh Amendment

right to trial by jury.  In addition, the appeal presents the Court with a question of apparent first impression, to-wit, whether state substantive law provides the proper federal standard for determining just compensation to property owners in NGA-authorized eminent domain proceedings.  The Terrys respectfully submit that oral argument will prove valuable to the Court's decisional process.

Respectfully submitted,

**8.37 ACRES OF LAND,** *et al.*

  */s/ Norman A. Thomas*
Norman A. Thomas
Va. State Bar No. 20632

Norman A. Thomas (VSB No. 20632)
NORMAN A. THOMAS, PLLC
1015 East Main Street, Lower Level
Richmond, VA 23219-3549
Telephone: (804) 303-9538
Email: norman@normanthomaslaw.com

Joseph V. Sherman (VSB No. 86099)
JOSEPH V. SHERMAN, P.C.
324 W. Freemason Street
Norfolk, Virginia 23510
Telephone: (757) 350-8308
Facsimile: (757) 351-4663
Email: joe@lawfirmjvs.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing Opening Brief of Appellant complies with Federal Rules of Appellate Procedure 28(a) and 32(a).  It contains <u>12,752</u> words exclusive of the disclosure statement, table of contents, table of authorities, signature and certificate. The brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

*/s/ Norman A. Thomas*
Norman A. Thomas
Va. State Bar No. 20632
